**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

PROVEN BUSINESS SKILLS, INC., on behalf of itself and on behalf of all others similarly situated,

Plaintiff,

vs.

PHOENIX AMERICAN HOSPITALITY, LLC, a Delaware limited liability company, AMERICAN HOSPITALITY PROPERTIES REIT, INC., AMERICAN HOSPITALITY PROPERTIES REIT II, INC., and WILLIAM LEE "PERCH" NELSON,

Defendants.

Case No.: 3:26-cv-3130

Judge:

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# COMPLAINT

Plaintiff Proven Business Skills Inc. ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings this class action lawsuit against Defendants Phoenix American Hospitality, LLC, a Delaware limited liability company ("PAH"), American Hospitality Properties Reit, Inc. ("REIT I"), American Hospitality Properties Reit II, Inc., ("REIT II") (together REIT I and REIT II are referred to as the "PAH REITs") and William Lee "Perch" Nelson (collectively, "Defendants"), alleges based upon personal knowledge as to Plaintiff's own acts, a review of Defendants public documents, the United States Securities and Exchange Commission ("SEC") filings[1] including the Complaint filed by the SEC, press releases regarding reports and information readily available on the internet, and information and belief as to all other matters the following:

[1] See Case No. 3:26-cv-01846-B, ECF. 1, filed June 4, 2026 (last visited September 1, 2026).

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired shares from Defendants in the PAH REITs from March 1, 2022, through July 31, 2024, both dates inclusive (the "Class Period") and were damaged thereby. Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 ("Exchange Act"), the Texas Securities Act ("TSA") and Texas law. The action charges that Defendants named herein violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

2. Defendants raised approximately $86 million from over 2,000 retail investors through negligent and deceptive representations and omissions of material facts. This conduct included making negligent and untrue statements, and omissions of material facts, regarding the assets held by, and profitability of, two hotel-focused investment funds.

3. PAH and the PAH REITs, through Nelson, raised this money while claiming that one fund owned as many as 11 hotels. However, this fund owned only a preferred equity interest in a single hotel until January 2024, when it acquired interests in other hotels. PAH, through Nelson, also made untrue statements that both funds made regular profit distributions of up to 12% per year to investors, when neither fund was profitable, and distributions were primarily funded by returns of investor capital.

4. As part of the deceptive conduct, Defendant Nelson directed a consulting firm to create and disseminate similar negligent and untrue statements, and material omissions, in marketing materials to investors and potential investors.

5. By engaging in the conduct described herein, Defendants violated and unless restrained and enjoined there is a reasonable likelihood of future violations of Section 10(b) and 20(a) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and the TSA.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than one hundred (100) members in the proposed class, and at least one (1) member of the class is a citizen of a state different from Defendant; 28 U.S.C. § 1331; and Section 27 of the Exchange Act.

7. This Court has supplemental jurisdiction over all other non-federal question claims pursuant to 28 U.S.C. §1367 because the other claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. §1367(a).

8. This Court has personal jurisdiction because Defendants, directly or indirectly, singly and in concert, made use of the means or instruments of transportation or communications in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint, certain of which occurred within this District. Defendants' intentional contacts with Texas are sufficient to establish this Court's specific jurisdiction.

9. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and 28 U.S.C. § 1391(b) because PAH maintains its principal place of business in this District, Defendant Nelson resides in this District, and certain of the acts and transactions constituting violations of the Exchange Act occurred in this District, including the offer and sale

of securities. PAH and Nelson disseminated the challenged representations and omissions from Dallas, Texas; PAH's investor relations and marketing personnel operated from Dallas; subscription agreements were processed in Dallas; and investor funds were routed to Texas accounts.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, seminars, dinners, and broadcasts.

## PARTIES

11. Plaintiff Proven Business Skills, Inc., is a Wyoming Corporation entirely owned by Richard C. Brown ("Brown"). Brown is a citizen and domiciliary of Las Vegas, Nevada, and through his company invested $50,000.00 in Defendant American Hospitality Properties REIT, Inc. on or about September 29, 2023. Before making said investment, Plaintiff received and reviewed marketing and solicitation materials disseminated by Defendants in connection with the offering, including webinar presentations, emails, and other written materials describing the offering and its anticipated returns. Plaintiff reviewed these materials and reasonably relied on the representations contained in them in deciding to invest $50,000 in REIT I. See Exhibit A. The materials Plaintiff received and relied upon were of the same character as those Defendants disseminated to the putative class generally.

12. Defendant Phoenix American Hospitality, LLC ("PAH") is a Delaware limited liability company with its principal place of business in Dallas, Texas. PAH manages investment vehicles that invest in U.S.-based hotels. PAH is wholly owned by Defendant Nelson and a trust he controls.

13. Defendant William Lee "Perch" Nelson, age 65, is a resident of Dallas, Texas. Nelson founded PAH in 2009 and served as its president until he consented to the entry of a final judgment in the SEC's enforcement action styled *Securities and Exchange Commission v. Phoenix American Hospitality, LLC and William Lee "Perch" Nelson*, No. 3:26-cv-01846-B (N.D. Tex. filed June 4, 2026) (ECF No. 1), Litigation Release No. 26560, dated June 5, 2026.

14. Defendant American Hospitality Properties Reit, Inc. ("REIT I") is a corporation formed by PAH and Nelson to invest in U.S.-based hotels using capital raised from retail investors pursuant to the Regulation A offering exemption [17 C.F.R. §§ 230.251–263]. REIT I is a Delaware corporation with its principal place of business in Dallas, Texas. At all relevant times, Nelson served as the chief executive officer ("CEO") and a director of REIT I. PAH and Nelson marketed REIT I as a real estate investment trust. But REIT I has not qualified as a real estate investment trust for U.S. income tax purposes.

15. Defendant American Hospitality Properties Reit II, Inc. ("REIT II") is a corporation formed by PAH and Nelson to invest in U.S.-based hotels using capital raised from retail investors pursuant to the Regulation A offering exemption [17 C.F.R. §§ 230.251–263]. REIT II is a Delaware corporation with its principal place of business in Dallas, Texas. In 2023, PAH and Nelson formed this second corporation to raise investment in U.S.-based hotels using capital raised from retail investors pursuant to the Regulation A offering exemption [17 C.F.R. §§ 230.251–263]. At all relevant times, Nelson served as CEO and a director of REIT II. PAH and Nelson marketed REIT II as a real estate investment trust. But REIT II has not yet qualified as a real estate investment trust for U.S. income tax purposes.[2]

[2] Defendants American Hospitality Properties Reit, Inc. & American Hospitality Properties Reit II, Inc., are referred to collectively as the "PAH REITs."

## FACTUAL ALLEGATIONS

### I. PAH and Nelson Offered and Sold Securities Issued by the PAH REITs.

16. In or about June 2021, PAH and Nelson engaged a consulting firm that specialized in directly marketing Regulation A and other exempt securities offerings to investors. The consulting firm helped PAH and Nelson create and successfully launch a marketing campaign that targeted retail investors through multiple means, including social media advertisements, a new website specific to REIT I, emails from PAH and Nelson, and live webinars hosted by Nelson that were later posted to PAH websites and YouTube.

17. PAH and Nelson provided, approved, and had ultimate authority over the substantive content of the statements concerning the PAH REITs disseminated through the marketing channels established by the consulting firm.

18. During the Class Period, PAH and Nelson offered and sold securities in the form of common stock issued by the PAH REITs via the marketing campaign described herein and by other means. Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] define "security" to include any "stock."

19. During the Class Period, PAH and Nelson raised about $56.6 million from around 1,300 investors in REIT I. These investors obtained about 6 million shares of common stock in REIT I. PAH stopped soliciting new investments in REIT I around the end of September 2023, when it launched REIT II. PAH and Nelson then raised about $29.4 million from around 750 investors in REIT II during the Class Period. These investors obtained about 3.1 million shares of common stock in REIT II.

### II. PAH, Through Nelson, Made Untrue Statements and Omissions of Material Fact to Investors.

20. In raising funds from investors, PAH and Nelson made written and oral negligent and untrue statements of material facts and omissions of material facts regarding the number of hotels owned by REIT I and the profitability of the PAH REITs. These negligent and/or reckless untrue statements, and omissions of material facts, contributed to an increase in fundraising for REIT I. Indeed, prior to March 2022, REIT I raised approximately $4.7 million from around 150 accredited investors. Thereafter, REIT I raised approximately $56.6 million from around 1,300 investors in less than two years, and REIT II raised approximately $29.4 million from around 750 investors in less than a year.

**A. Negligent and Untrue Statements and Omissions Concerning REIT I's Hotel Investments.**

21. From inception until January 2024, REIT I's only hotel investment was a September 2020 $1.5 million preferred equity investment in a single hotel. However, when marketing REIT I from March 2022 until October 2023, PAH and Nelson made negligent and/or reckless materially untrue statements in oral and written communications to investors and potential investors indicating that REIT I owned more than one hotel, including, but not limited to, the statements below.

22. On March 22, 2022, PAH sent a marketing email to potential investors stating that REIT I "acquired a preferred interest in two new hotels" located in Fort Wayne, Indiana, and announced that the transaction brought REIT I's "total to three hotels owned and operated."

23. On August 10, 2022, PAH, through Nelson, sent a marketing email to existing REIT I investors in which Nelson stated "that four (4) hotel properties have been added to your REIT select service portfolio, with a fifth closing very soon, with more on the horizon. They are all performing very well, ahead of budget in fact." Nelson listed the four hotels in his email.

24. On October 12, 2022, Nelson wrote to the consulting firm that "[w]e are announcing the addition of 7 more hotels, today" and directed the firm to update REIT I's website to make the untrue statement that REIT I had "already purchased . . . eleven (11) hotels," even though at that time REIT I only owned a preferred equity interest in a single hotel.

25. Nelson further directed the consulting firm to conduct an email campaign to tout each of the seven new hotels REIT I had allegedly purchased in separate messages sent to potential and existing investors in or about October 2022.

26. From around November 2022 through July 2023, PAH and Nelson sent automatic "welcome" emails to "new leads" from Nelson's personal email account that stated REIT I had "already purchased eleven (11) hotels at COVID devalued pricing."

27. PAH, through Nelson, made similar untrue statements concerning REIT I's hotel investments during webinars he hosted in December 2022, January 2023, and February 2023. In those webinars, Nelson made untrue statements that REIT I had acquired 11 hotels and, in the December 2022 webinar, estimated that the purchases resulted in "probably . . . $120 million worth of assets in this fund thus far." In addition to the live broadcasts, recordings of the webinars, including the untrue statements, remained available for investors to review on PAH's YouTube channel through at least the end of the Class Period.

28. The foregoing statements about the number of hotels REIT I owned were untrue because REIT I did not, at the time the statements were made, own the number of hotels PAH and Nelson stated. From July 2019 to January 2024, REIT I's only hotel investment was the preferred equity investment it made in a single hotel in 2020.

29. The above untrue statements and omissions regarding the hotels owned by REIT I were material to investors and potential investors because statements regarding the assets owned by a company would be important to a reasonable investor.

### B. Negligent, Knowing, and Reckless Untrue Statements and Omissions Concerning the PAH REITs Investor Distributions from Profits.

30. Beginning no later than May 2022, PAH and Nelson made materially untrue statements in written and oral communications indicating that REIT I was making up to 12% annualized distributions to investors from profits, including but not limited to the statements below.

31. In a webinar aired on or about December 22, 2022, PAH, through Nelson, stated: "In 2022, we paid out to our investors an annualized average distribution of a little bit over 12%." Nelson then said that "it's important for our investors to know that the REIT structure to stay in compliance of both SEC and IRS guidelines we have to distribute 90% of our operating income." He later said, "again going back to the idea of the REIT having to distribute 90% of their operating income, we paid a bonus distribution this month . . . and the reason we did that was to stay in compliance with . . . the 90% rule." These statements indicate that REIT I had taxable income and was therefore profitable. PAH, through Nelson, further made the untrue statement to investors that "monthly [and] bonus distributions . . . are solely based on net operating income."

32. PAH, through Nelson, reiterated these points in a January 2023 webinar, saying "the investors that were in our . . . REIT fund at year-end were fortunate enough to receive a bonus distribution and that bonus distribution was 18% annualized. The reason that happened was as I mentioned a minute ago is that we had to distribute that income and that was a true up if you will of the distributions to make sure that we were in compliance with the SEC and the IRS rules regarding REITs."

33. On January 21, 2023, PAH, through Nelson, sent a marketing email to investors and potential investors stating that REIT I significantly outperformed the S&P 500 stock market index during 2022 by "distribut[ing] monthly profits at a 12% annualized rate (over an even longer period – 10/31/21 - 12/31/22)."

34. In a February 2023 webinar, PAH, through Nelson, indicated REIT I had been able to sustain a 12% distribution and said "the reason we're able to do this is because we have acquired 11 hotels in this REIT already and so that's where the operating income is coming from in order to support these distribution levels." In a later February 2023 webinar, PAH, through Nelson, stated that REIT I's distribution was "dependent on the performance of the hotels" and resulted from, in part, a "great deal of revenue increase."

35. After REIT I stopped soliciting new investments in September 2023, and PAH launched REIT II, on October 12, 2023, PAH distributed an email to potential investors announcing REIT II and its intent to build on the purported success of REIT I and stated that the PAH REITs "make those payouts [the distributions] from operating profits, which we have a track record of accomplishing."

36. PAH, through Nelson, also directed the consulting firm to create and disseminate materials containing the untrue statement that the PAH REITs were making up to 12% annualized distributions to investors from profits. For example, Nelson directed the consulting firm to program a REIT II website to automatically generate emails to potential investors who downloaded an investment guide from October 2023 through the remainder of the Class Period. The content that Nelson provided for the automatic emails included the untrue statement: "How could you generate PASSIVE MONTHLY INCOME? . . . Operating Profits . . . We own AND operate our hotels . . . We distribute any profits monthly."

37. PAH, through Nelson, approved the content of an "explainer video" linked in marketing emails and on a REIT II-specific website from at least October 2023 through the remainder of the Class Period. The video included a slide stating: "Our first REIT [REIT I] has delivered 12% annualized return, distributed monthly [s]ince 10/31/21." It then showed the following untrue slide:




An actor's voiceover on the video also made the untrue statement while the above slide was projected on the screen that "distributions come from profit generated from running and optimizing our hotels."

38. During a December 2023 webinar, after a participant asked whether distributions were "dependent on the performance of the hotels in the REIT," Nelson stated: "Absolutely. This is an investment and . . . clearly if the hotels are not producing cash flow to support distributions there will be no distributions, unfortunately. But that has not been the case."

39. On December 26, 2023, PAH sent a marketing email to potential REIT II investors and stated that a forthcoming "bonus distribution" to investors would be "based on our strong operating profit in Q4."

40. The foregoing and similar statements about the source of distributions to investors were untrue because the PAH REITs did not make the distributions out of operating income, net income, or profits. At all times from May 2022 through the end of the Class Period, neither REIT I nor REIT II had the profits indicated, including specifically at the time of each of the statements

made above. REIT I obtained just over $200,000 in total earnings from its single preferred equity hotel investment from inception through December 31, 2022. But it distributed over $1.4 million to investors during the same period. REIT I had about $5,000 in total hotel-related earnings in all of 2023 from its single preferred equity hotel investment. But it distributed over $5 million to investors in 2023. REIT II did not have any hotel assets until the first quarter of 2024, so it could not have generated any operating profit in 2023.

41. The above untrue statements and omissions regarding the source of distributions to investors were material to investors and potential investors because statements indicating that a company had sufficient income or profits to annually pay a 12% distribution would be important to a reasonable investor.

**C. PAH and Nelson Made These Untrue Statements with Scienter.**

42. Nelson knew or was severely reckless in not knowing that the above-described statements concerning the number of hotels owned by REIT I and the profitability of the PAH REITs directly and on behalf of PAH were untrue when made.

43. As CEO of the PAH REITs and president of PAH, which managed the PAH REITs, Nelson held ultimate responsibility for all investment decisions made by the PAH REITs. As such, he knew or was severely reckless in not knowing when the PAH REITs had made hotel investments, how much the PAH REITs had invested in those hotels, and whether the PAH REITs were profitable.

44. Defendants had access to information about PAH and PAH REIT's ownership of assets, or lack thereof, and did not properly disclose this information to Plaintiff or other investors.

45. Accordingly, Nelson knew, or was severely reckless in not knowing, that REIT I did not own as many as 11 hotels before January 2024. And he knew, or was severely reckless in not knowing, that REIT I only held a preferred equity interest in a single hotel until January 2024.

46. Similarly, Nelson knew, or was severely reckless in not knowing, that statements indicating the PAH REITs were making investor distributions from income or profits were untrue. Nelson knew, or was severely reckless in not knowing, that the PAH REITs funded distributions with offering proceeds, not profits.

47. Throughout the Class Period, Nelson exercised control over PAH, was acting within the scope of his authority to make representations on behalf of PAH, and did in fact make the representations described above on behalf of PAH.

48. The scienter of Nelson is imputed to PAH.

### D. PAH and Nelson Were the Makers of the Untrue Statements and Omissions.

49. PAH and Nelson made the untrue statements and omissions enumerated above. As described above, PAH sent numerous marketing emails to potential and existing investors that contained untrue statements. As the owner and president of PAH, Nelson held ultimate authority over PAH's statements and the substantive content of the statements PAH and Nelson directed the consulting firm to make. Nelson also made untrue statements directly on behalf of PAH, including in marketing emails he sent from his PAH email account and statements he made orally during investor-facing webinars.

50. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading.

### E. PAH and Nelson Obtained Money or Property from Their Misconduct.

51. During the Class Period, the PAH REITs obtained money from investors via the untrue statements made by PAH and Nelson when marketing the PAH REITs. The PAH REITs then paid PAH fees for services it performed under the terms of the PAH REITs' offering circulars. Also, as disclosed in the PAH REITs' offering circulars, the PAH REITs paid fees to a PAH subsidiary that performed onsite management of the PAH REITs' hotels. And Nelson took cash ownership draws from PAH. PAH funded these draws at least in part with payments PAH received from the PAH REITs.

## III. PAH and the PAH REITs, Through Nelson, Engaged in Deceptive Conduct to Defraud Investors.

52. PAH and Nelson engaged in deceptive acts and practices to defraud investors in connection with the offer and sale of securities described above.

53. In addition to making the untrue statements identified above, PAH, through Nelson, engaged in other deceptive conduct by directing the consulting firm to create and disseminate untrue statements in marketing materials to investors and potential investors as identified above.

54. Plaintiff and Class members relied on the marketing materials provided by Defendants or their agent in making the decision to invest in Defendants' securities.

55. Nelson knew or was severely reckless in not knowing that he was engaging in the deceptive conduct, misstatements, and omissions alleged above and that the conduct worked to defraud investors as part of his and PAH's fraudulent scheme.

56. Throughout the Class Period, Nelson exercised control over PAH, was acting within the scope of his authority to direct the consulting firm on behalf of PAH and directed the consulting firm to make the misrepresentations and omissions described above on behalf of PAH.

## CLASS ACTION ALLEGATIONS

57. Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

58. Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of a class consisting of:

Nationwide Class:

> All persons and entities other than Defendants that purchased or otherwise acquired securities in the PAH REITS between March 1, 2022, and July 31, 2024, both dates inclusive (the "Class") seeking to recover damages caused by Defendants' violations of the federal securities laws to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, SEC Rule 10b-5 promulgated thereunder, the Texas Securities Act, and Texas Law against Defendants and their top executive, Defendant Nelson.

Excluded from the Class are Defendants, former and current officers and directors of PAH, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above. Also excluded are the Judge and/or Magistrate Judge and their staff. Plaintiff reserves the right to amend the Class definition and/or create subclasses.

59. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, it can be ascertained through appropriate discovery. Defendants offered equity in the PAH REITs from March 2022 through July 2024 utilizing the false and material statements alleged herein. As such, the exact number of Class members is unknown to the Plaintiff at this time and can only be ascertained through appropriate discovery. Based upon publicly available information from the SEC's investigation, there are approximately 2,000 members in the putative Class. Investors and other members of the Class may be identified from records maintained by Defendants or their agent.

60. Plaintiff's claims are typical of the claims of members of the Class as all members of the Class are similarly affected by Defendants' uniform wrongful conduct in violation of Texas and federal law complained of herein.

61. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

62. A class action is proper because "there are questions of law or fact common to the class," and such questions predominate over individualized questions affecting sole members of the Class. Fed. R. Civ. P. 23(a)(2). Common questions for the Class include:

i. Whether Defendants' acts violated the applicable federal and state securities laws as alleged herein.

ii. Whether the offering materials omitted and/or misrepresented material facts about the business, operations, finances, and prospects of Defendants;

iii. Whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

iv. Whether Individual Defendant Nelson was a control person of PAH and its related entities;

v. Whether the prices of the securities sold during the Class Period were artificially inflated because of Defendants' actions or omissions; and

vi. To what extent members of the Class sustained damages and the measure of damages.

63. A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

64. Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the claims alleged herein primarily sound in omission of material information.

## CAUSES OF ACTION

### COUNT I
### Violations of Section 10(b) of the Exchange Act of 1934, Rule 10b-5(a) & (c) Promulgated Thereunder Against All Defendants

65. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66. During the Class Period, PAH, Nelson, and the PAH REITs employed devices and artifices to defraud, and carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period did: (a) deceive the investing public, including Plaintiff and other Class members as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Defendants' securities at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, PAH and Nelson made negligent and misleading statements, omitted material facts, and engaged in unlawful conduct alleged herein.

67. Defendants directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or severely recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons. Defendants used the money raised through the sale of their securities as their personal slush fund, while also bringing said money into their control through a process of materially false statements and the omission of material information a reasonable investor would need to know in order to make an informed investment decision.

68. The above-mentioned Defendants directly or indirectly, by means of interstate commerce, employed a manipulative or deceptive device in connection with the sale of their equity securities by directly, and through various offering materials, omitting material information necessary for investors to make informed decisions regarding their decisions to invest.

69. During the time of such deceptive and manipulative practices, the above-mentioned Defendants were engaging in acts, practices, and a course of business that operated as fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Defendants' equity securities during the Class Period.

70. The above-mentioned Defendants' deceptive and manipulative practices have directly and proximately caused Plaintiff and Class members to experience serious economic harm. Plaintiff and Class Members have lost substantial amounts in investment capital, or for many their retirement savings, leaving their financial future uncertain.

**COUNT II**
**Violations of Section 10(b) of the Exchange Act Rule 10b-5(b) Promulgated Thereunder Against All Defendants**

71. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73. During the Class Period, Defendants made material misstatements to investors, *inter alia*, (a) PAH sent a marketing email to potential investors stating that REIT I "acquired a preferred interest in two new hotels" located in Fort Wayne, Indiana, and announced that the transaction brought REIT I's "total to three hotels owned and operated."; (b) PAH, through Nelson, sent a marketing email to existing REIT I investors in which Nelson stated "that four (4) hotel

properties have been added to your REIT select service portfolio, with a fifth closing very soon, with more on the horizon. They are all performing very well, ahead of budget in fact."; (c) in or around November 2022 through July 2023, PAH and Nelson sent automatic "welcome" emails to "new leads" from Nelson's personal email account that stated REIT I had "already purchased eleven (11) hotels at COVID devalued pricing."; and (d) PAH, through Nelson, made similar untrue statements concerning REIT I's hotel investments during webinars he hosted in December 2022, January 2023, and February 2023. In those webinars, Nelson made untrue statements that REIT I had acquired 11 hotels and, in the December 2022 webinar, estimated that the purchases resulted in "probably . . . $120 million worth of assets in this fund thus far." Defendants also omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and made material affirmative misrepresentations, inter alia, (a) the webinars, including the untrue statements, remained available for investors to review on PAH's YouTube channel through at least the end of the Class Period; (b) foregoing statements about the number of hotels REIT I owned were untrue because REIT I did not, at the time the statements were made, own the number of hotels PAH and Nelson stated. From July 2019 to January 2024, REIT I's only hotel investment was the preferred equity investment it made in a single hotel in 2020; (c) The foregoing and similar statements about the source of distributions to investors were untrue because the PAH REITs did not make the distributions out of operating income, net income, or profits. At all times from May 2022 through the end of the Class Period, neither REIT I nor REIT II had the profits indicated, including specifically at the time of each of the statements made above. REIT I obtained just over $200,000 in total earnings from its single preferred equity hotel investment from inception through December 31, 2022. But it distributed over $1.4 million to investors during the same period. REIT

I had about $5,000 in total hotel-related earnings in all of 2023 from its single preferred equity hotel investment. But it distributed over $5 million to investors in 2023. REIT II did not have any hotel assets until the first quarter of 2024, so it could not have generated any operating profit in 2023.

74. These misstatements, affirmative representations, and omissions identified herein are more fully described above. Such misrepresentations were intended to, and, throughout the Class Period, did: (i) deceive public investors, including Plaintiff and Class members as alleged herein; (ii) artificially inflated the price of Defendants' securities; and (iii) caused Plaintiff and other members of the Class to purchase or otherwise acquire Defendants' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

75. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly with the preparation and/or issuance of the offering materials and other documents described above that were designed to influence Plaintiff and Class Members' purchase of, and the market for, Defendants' securities. By virtue of his position, responsibilities and control at PAH and its related entities, Defendant Nelson had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and other members of the Class. Alternatively, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew

or recklessly disregarded the material facts that were being misrepresented or omitted as described above.

76. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executive and/or director, Defendant Nelson had knowledge of the details of Defendants' internal affairs.

77. Had Plaintiff and other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Defendants' securities was substantially lower than the prices paid by Plaintiff and other members of the Class.

78. Because of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of Defendants' securities during the Class Period, upon the disclosure that Defendants had been disseminating material misrepresentations.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act Against Defendant Nelson**

80. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81. During the Class Period, Individual Defendant Nelson participated in the operation, management, and day-to-day control of PAH and its related entities. Nelson conducted and participated, directly and indirectly, in the conduct of PAH's and the PAH REITs' business affairs.

Because of his senior position, he knew the adverse non-public information about Defendants' misstatements of distributions and ownership interest in other hotels. Further, Nelson held himself out to investors as knowledgeable about the misrepresented topics, including the PAH REITs' ownership in other hotels and distributions.

82. Defendant Nelson had a duty to disseminate accurate and truthful information with respect to Defendants' financial condition and results of operations and correct promptly any misstatements or omissions that may be material or misleading under the circumstances in which they were made.

83. Because of his control and authority, Defendant Nelson was able to, and did, control the contents of various communications and offering materials with Plaintiff and Class Members. Throughout the Class Period, Defendant Nelson exercised his power and authority to cause PAH and its related entities to engage in the wrongful acts complained of herein. Defendant Nelson was a "controlling person" of PAH within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged, which artificially inflated the price of Defendants' securities and resulted in Plaintiff and Class members' purchase of said securities.

84. Because of the above conduct, Defendant Nelson is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PAH.

**COUNT IV**
**Offeror or Seller Liability: Untruth or Omission Under Tex. Gov't Code §4008.052(a)**
**Against All Defendants**

85. Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

86. This cause of action is brought pursuant to Tex. Gov't Code §4008.052(a), on behalf of the Plaintiff and Class Members against Defendants based on omissions that Defendants made in connection with the offer and sale of equity securities during the Class Period.

87. A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to purchase a security because it would significantly alter the total mix of information made available. A reasonable investor would consider information regarding the profits to be distributed following an investment, including the timeline and expected amounts of said distributions, as well as the assets owned—and the extent of that ownership whether limited (or in certain instances fictional)—to be material and important in considering the total mix of information.

88. Defendants omitted material facts concerning the profits to be distributed following an investment, including the timeline and expected amounts of said distributions, as well as the assets owned—and the extent of that ownership whether limited (or in certain instances fictional). These omissions were made knowing that the withholding of such information under the circumstances was misleading.

89. Plaintiff and Class Members purchased the equity securities that were sold within the Class Period. Plaintiff and Class Members are within the statute of limitations pursuant to Tex. Gov't Code §4008.062(b) because it has been less than three years since the Plaintiff and Class Members could have been on notice of the Defendants' material omissions. Plaintiff and Class Members were notified, or should have discovered such omissions, when the SEC filed its complaint against Defendants PAH and Nelson on June 4, 2026, and settled the enforcement action and final judgments were entered against Defendants PAH and Nelson on June 5, 2026.

90. The omissions made by the above-mentioned Defendants have directly and proximately caused Plaintiff and the Class Members to suffer serious economic loss. Plaintiff and Class Members have lost substantial amounts in investment capital, for many their retirement savings, leaving their financial future uncertain.

**COUNT V**
**Control Person Liability Under Tex. Gov't Code §4008.055(a)**
**Against Defendant Nelson**

91. Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

92. This cause of action is brought pursuant to Tex. Gov't Code §4008.055(a) on behalf of the Plaintiff and Class Members against Defendant Nelson within the meaning of 7 Tex. Admin. Code §107.2(9).

93. Defendant Nelson was the control person of the above-mentioned Defendants within the meaning of 7 Tex. Admin. Code §107.2(9) due to his power to direct or cause the direction of the institution's management and policies through ownership, contract, and position as president, CEO, and/or Director of the entity Defendants.

94. As control persons of the above-mentioned entity Defendants, Nelson directly possessed the power to direct or cause the direction of the management and policies of such entities, including the issuance of their equity securities, oversight over the securities' offering materials, and strategy regarding the solicitation and advertising plan. As such, Nelson directly controlled the above-mentioned entity Defendants in their securities offerings to Plaintiff and Class Members, the contents of offering materials distributed to potential investors, and strategy to implement material misrepresentations and omissions.

95. As control person of the above-mentioned entity defendants Defendant Nelson is liable pursuant to Tex. Gov't Code §4008.055(a) with and to the same extent as the above-mentioned Defendants for their violations of §4008.052(a).

**COUNT VI**
**Negligent Misrepresentation Under Texas State Law**
**Against All Defendants**

96. Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

97. This cause of action contains elements derived from *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 443 (Tex. 1991), which requires: "(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation."

98. A reasonable investor would consider information regarding the profits to be distributed following an investment, including the timeline and expected amounts of said distributions, as well as the assets owned—and the extent of that ownership whether limited (or in certain instances fictional)—to be material and important in considering the total mix of information. Yet Defendants omitted this information.

99. Defendants' material omissions made their representations false when made to investors concerning the profitability of the hotel investments based on false information. Such false misrepresentations included: (a) PAH sent a marketing email to potential investors stating that REIT I "acquired a preferred interest in two new hotels" located in Fort Wayne, Indiana, and announced that the transaction brought REIT I's "total to three hotels owned and operated."; (b) PAH, through Nelson, sent a marketing email to existing REIT I investors in which Nelson stated "that four (4) hotel properties have been added to your REIT select service portfolio, with a fifth closing very soon, with more on the horizon. They are all performing very well, ahead of budget in fact."; (c) in or around November 2022 through July 2023, PAH and Nelson sent automatic "welcome" emails to "new leads" from Nelson's personal email account that stated REIT I had "already purchased eleven (11) hotels at COVID devalued pricing."; and (d) PAH, through Nelson,

made similar untrue statements concerning REIT I's hotel investments during webinars he hosted in December 2022, January 2023, and February 2023. In those webinars, Nelson made untrue statements that REIT I had acquired 11 hotels and, in the December 2022 webinar, estimated that the purchases resulted in "probably . . . $120 million worth of assets in this fund thus far.". Defendants also omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and made material affirmative misrepresentations, inter alia, (a) the webinars, including the untrue statements, remained available for investors to review on PAH's YouTube channel through at least the end of the Class Period; (b) foregoing statements about the number of hotels REIT I owned were untrue because REIT I did not, at the time the statements were made, own the number of hotels PAH and Nelson stated. From July 2019 to January 2024, REIT I's only hotel investment was the preferred equity investment it made in a single hotel in 2020; (c) The foregoing and similar statements about the source of distributions to investors were untrue because the PAH REITs did not make the distributions out of operating income, net income, or profits. At all times from May 2022 through the end of the Class Period, neither REIT I nor REIT II had the profits indicated, including specifically at the time of each of the statements made above. REIT I obtained just over $200,000 in total earnings from its single preferred equity hotel investment from inception through December 31, 2022. But it distributed over $1.4 million to investors during the same period. REIT I had about $5,000 in total hotel-related earnings in all of 2023 from its single preferred equity hotel investment. But it distributed over $5 million to investors in 2023. REIT II did not have any hotel assets until the first quarter of 2024, so it could not have generated any operating profit in 2023.

100. Defendants did not exercise reasonable care or competence in failing to communicate complete and accurate information to the Plaintiff and Class Members. The actual communications and representations with Plaintiff and Class Members contained the above-mentioned omissions, which shielded investors from the reality of the securities being offered.

101. Defendants' negligent misrepresentations, and Plaintiff's and Class Members' reliance, have directly and proximately caused serious economic loss. Plaintiff and Class Members have lost substantial amounts in investment capital, for many their retirement savings, making their financial future uncertain.

**Count VII**
**Unjust Enrichment Under Texas State Law**

102. Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

103. This cause of action derives from *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010), which provides the doctrine of unjust enrichment to be available "when one person has obtained a benefit from another by fraud, duress, or the taking of undue advantage."

104. Defendants made material omissions in connection with the offer and sale of their equity securities as alleged herein.

105. Defendants omitted material facts concerning the information regarding the profits to be distributed following the investment, including the timeline and expected amounts of said distributions, as well as the assets owned—and the extent of that ownership, whether limited (or in certain instances fictional) of the PAH REITs.

106. Defendants accepted and retained a substantial benefit under these circumstances that makes it inequitable for them to retain without payment for its value.

107. Defendants have directly and proximately caused Plaintiff and the Class Members to suffer serious economic loss through the retention of this economic benefit. Plaintiff and Class Members have lost substantial amounts in investment capital, for many their retirement savings, making their financial future uncertain.

## JURY TRIAL DEMANDED

108. Plaintiff and Class Members hereby request and demand a jury trial for each cause of action permitting trial by jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, individually and on behalf of the Class, demand judgment as follows:

109. Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23 and certifying Plaintiff as the Class representative;

110. Requiring Defendants to pay compensatory damages jointly and severally in favor of the Plaintiff and the Class for all damages sustained by reason of the acts and transactions alleged herein;

111. Awarding Plaintiff and Class Members rescission, disgorgement, and all other remedies in equity or in law pursuant to the Exchange Act; and

112. Awarding Plaintiff and Class Members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

113. Awarding such further relief as the Court deems just and proper.

DATED: September 15, 2026

Respectfully Submitted,

*/s/ William B. Federman*
William B. Federman, TBA #00794935
Alex J. Ephraim, OBA #34959
Anushe Zebal, TBA #24143548
FEDERMAN & SHERWOOD
212 W. Spring Valley Road,
Richardson, TX 75081
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
Email: wbf@federmanlaw.com

Gary S. Menzer *
**MENZER & HILL, P.A.**
2255 Glades Road
Suite 324-A
Boca Raton, FL 33431
Telephone: (561) 327-7207
Facsimile: (561) 880-8449
gmenzer@menzerhill.com

*Pro hac vice application forthcoming
***ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS***